IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**MICHELLE MCLAURIN,**

   **Plaintiff,**

**v.**

**GEORGIA DEPARTMENT OF
NATURAL RESOURCES and/or MARK
WILLIAMS, in his official capacity, and
LARRY BLANKENSHIP, in his
individual capacity,**

   **Defendants.**

**CIVIL ACTION FILE**

**No. 1:22-CV-03601-SCJ**

## O R D E R

This matter appears before the Court on the May 2, 2024 Non-Final Report and Recommendation ("R&R") (Doc. No. [120]) issued by the Honorable J. Clay Fuller, United States Magistrate Judge. Judge Fuller recommends that the Motion to Exclude Testimony be **GRANTED** in part  and **DENIED** in part. Judge Fuller further recommends that the Motion for Summary Judgment be **DENIED**. Defendants have filed objections to the R&R. Doc. No. [124]. Plaintiff has filed a response in opposition to Defendants' objections. Doc. No. [125].

## I.    BACKGROUND

No objections were made to the procedural history and factual background sections of the R&R. Therefore, the Court incorporates the Magistrate Judge's procedural history and factual background sections as fully set forth herein.

### A. Procedural History

Plaintiff, a former employee of Georgia Department of Natural Resources ("DNR") and/or the DNR Commissioner[1] ("Defendants"), filed a Complaint with the Georgia Commission on Equal Opportunity ("GCEO") and a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). Doc. No. [1-1] at 13–14. Id. Plaintiff originally filed this action in the Superior Court of Cobb County, Georgia, alleging ten claims: (1) violation of the Due Process Clause under the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983; (2) interference with her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; (3) retaliation under the FMLA; (4) disability discrimination under the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*;

---

[1] Walter Rabon became the Commissioner of DNR on August 22, 2023, and "was automatically substituted for Mark Williams as a party in this action in his official capacity." Doc. No. [91-2], 1.

(5) failure to accommodate under the ADA; (6) retaliation under the ADA; (7) discrimination under Section 504 of the Rehabilitation Act of 1973 ("Rehab Act"), as amended, 29 U.S.C. § 794 *et seq.*; (8) failure to accommodate under the Rehab Act; (9) retaliation under the Rehab Act; and (10) retaliation under the Georgia Whistleblower Act ("GWA"), O.C.G.A. § 45-1-4(a)(5). Id. at 18–37. In September 2022, Defendants removed the action to this Court asserting that this Court has federal question jurisdiction over Plaintiff's Fourteenth Amendment Due Process, ADA, FMLA, and Rehab Act claims. Doc. [1], 3.

On September 14, 2022, Defendants filed a Motion to Dismiss (Doc. No. [4]), seeking dismissal of all of Plaintiff's claims except for those brought under the Rehab Act and GWA. Id. at 4. On July 11, 2023, in a Report and Recommendation, Judge Fuller recommended that Defendants' Motion To Dismiss be granted as to Plaintiff's FMLA claims for damages on the basis of sovereign immunity and as to Plaintiff's claims asserted pursuant to 42 U.S.C. §1983 (Count I), and that Defendants' Motion To Dismiss be denied as to Plaintiff's ADA claims on the basis of sovereign immunity. Doc. No. [55]. In an Order dated September 5, 2023, this Court adopted the recommendation. Doc. No. [74].

3

On November 8, 2023, Defendants filed a Motion for Summary Judgment (Doc. No. [91]) accompanied by a brief in support (Doc. [91-1]), a Statement of Material Facts (Doc. No. [91-2]), and supporting exhibits (Doc. No. [91-4]–[91-12]). Plaintiff submitted a response brief (Doc. No. [114]), a Response to Defendants' Statement of Material Facts (Doc. No. [112]), and a Statement of Additional Material Facts (Doc. No. [113]). Defendants submitted a reply brief (Doc. No. [116]) and a Response to Plaintiff's Statement of Additional Material Facts (Doc. No. [117]).

On November 8, 2023, Defendants also filed a Motion to Exclude (Doc. No. [92]) with an exhibit (Doc. No. [92-1]). Plaintiff responded to that motion (Doc. No. [106]) with an exhibit (Doc. No. [106-1]), and Defendants replied and included a notice of objection (Doc. No. [118]).

On May 2, 2024, Judge Fuller issued the R&R that is currently before the Court. Doc. No. [120]. No objections were filed to the recommendation related to the Motion to Exclude. Defendants filed objections to aspects of the recommendation related to the Motion for Summary Judgment. Doc. No. [125]. Those objections are addressed below.

4

## B.    Facts

From the Fall 2018, Plaintiff worked in the Wildlife Conservation Section ("WCS") of DNR's Wildlife Resources Division ("WRD") as a Budget Analyst/Administrative Operations Manager ("AOM"). Doc. No. [91-2], ¶ 1 . The WRD receives federal financial assistance. Doc. No. [113], ¶ 4. WCS Chief Jon Ambrose supervised Plaintiff until March 2021. Doc. No. [91-2], ¶ 2. The Parties dispute exactly when WCS Assistant Chief, Matt Elliot, started to supervise Plaintiff. Defendants assert that in the first quarter of 2021, Elliot became Plaintiff's supervisor, instead of Ambrose, and that Plaintiff became the direct supervisor of WCS administrative assistant, Margie Dent. Doc. No. [91-2], ¶ 3. Plaintiff asserts that Elliot did not begin supervising her until March 2021 and that she was told in July or August 2021 that Elliot wanted her to supervise Dent. Doc. No. [112], ¶ 3.

Plaintiff was the lead administrator for the WCS, and her role included developing and monitoring WCS's budget and budget amendments; monitoring contracts and grants; printing and processing invoices for grants; maintaining financial records and monitoring expenditures; conducting purchasing and procurement; assisting with phone coverage; providing administrative and

5

technical support to the WCS and the WCS Chief; and providing frequent and timely communication with her supervisors and other staff members who worked on grants and budgets. Doc. Nos. [91-2], ¶¶ 4, 7; [113], ¶ 54. The Parties dispute whether Plaintiff's duties included maintaining budget and grant paper files. Defendants assert that Plaintiff was responsible for maintaining budget and grant files, while Plaintiff asserts that she maintained some paper files which were mostly duplicative of electronic documents already received and not urgent. Doc. No. [91-2], ¶ 4; Doc. No. [112], ¶ 4.

Defendants' telework policy stated that "[a]pproval of a schedule which includes regular teleworking more than 2 days per week is rare, is not appropriate for most jobs, and requires approval by the Division Director." Doc. No. [91-2], ¶ 13. Before March 2020, Plaintiff worked in the WRD headquarters at Social Circle, Georgia four days a week and was approved for telework one day a week. Doc. No. [91-2], ¶ 14. In March 2020, Plaintiff began teleworking on a full-time basis.[2] Doc. Nos. [91-2], ¶ 15; [113], ¶ 20. The Parties dispute whether Defendants permitted full-time teleworking positions. Defendants assert that

---

[2] From March to December 2020, Plaintiff came into the office three times, including on April 29, June 3, and June 4. Doc. No. [91-2], ¶ 20.

office staff were expected to be in the office at a minimum of one day a week, but Ambrose permitted Plaintiff to work fully remote because of her underlying health conditions and Covid-19 concerns. Doc. No. [91-2], ¶ 16. Plaintiff asserts that some WRD administrative staff worked fully remote. Doc. No. [112], ¶¶ 10, 16. Defendants' official policy for COVID-19 mitigation in the workplace was the Centers for Disease Control ("CDC") guidelines, including the wearing of facemasks in the office. Doc. No. [113], ¶ 11. The Parties dispute whether masks were actually required in the office. Human Resources Director, Larry Blankenship, testified that facemasks "were going to be required in Plaintiff's presence[.]" Blankenship Dep. 196; Doc. No. [117], ¶ 12. Plaintiff asserts that "in practice, there was no facemask mandate" in the office. Doc. No. [113], ¶ 12.

In early August 2020, Plaintiff and Ambrose communicated about phasing in days for Plaintiff to work in-person. Doc. No. [91-2], ¶ 22; see also Doc. No. [90-5], 4. On August 13, 2020, Ambrose emailed Plaintiff the following:

> Can you provide some details on your specific medical conditions that lead to a risk factor of 4.5X? I am trying to make the case for a more limited work schedule and your overall concerns about the future trajectory of infections are valid, but those concerns are shared by others here who are reporting 2-3 days a week to the office. We can discuss by phone if you prefer, and you can be assured that I won't share personal information with anyone other Ted Will.

> Though I was hoping to avoid it, we may need a letter from your doctor to help resolve this issue.

Doc. No. [90-5], 3. On August 14, 2020, Plaintiff asked Ambrose to permit her to continue teleworking on a full-time basis because of her medical conditions and the fact that employees in her office were not wearing facemasks or practicing social distancing. Doc. Nos. [113], ¶ 38; [90-5], 2–3. On September 9, 2020, Plaintiff submitted a doctor's note to Ambrose that she received on August 20, 2020, which stated, "To Whom It May Concern: Plaintiff has underlying health conditions including hypertension." Doc. Nos. [91-2], ¶ 32; [88-8], 1–2, 5. Ambrose informed Plaintiff that Defendants would not approve her request for full-time telework based on the doctor's note she submitted. Doc. No. [91-2], ¶ 33. On September 18, 2020, Ambrose emailed Plaintiff, discussing in part, Defendants' Covid-19 precautions in the office and her doctor's note. Doc. Nos. [91-2], ¶ 30; [88-9], 1–2. On September 18, 2020, WRD Assistant Director, Ted Will informed Plaintiff that she would no longer be permitted to work fully remote and would have to take Family Medical Leave for health reasons, unless she provided a more specific note by the following Tuesday. Doc. Nos. [91-2], ¶ 34; [113], ¶ 40.

8

On September 22, 2020, Plaintiff submitted an initial request for FMLA leave to use for her own serious health condition. Doc. No. [91-2], ¶ 35. Plaintiff's request was for intermittent FMLA leave. Doc. No. [113], ¶ 43. On October 6, 2020, Plaintiff received a "Notice of Eligibility and Rights and Responsibilities" for FMLA, which informed her that she met the eligibility requirements for taking family medical leave but that she "must return the following information to [Defendants] by October 20, 2020[:] Sufficient certification to support [Plaintiff's] request for FMLA[.]" Doc. No. [91-2], ¶ 36; Doc. No. [88-16], 1. Plaintiff's FMLA "Certification of Health Care Provider for Employee's Serious Health Condition" paperwork was signed by Plaintiff's medical provider on October 6, 2020. Doc. Nos. [91-2], ¶ 37; [88-17], 1–5.

Blankenship initially approved Plaintiff's request for intermittent FMLA leave to begin on September 28, 2020 for 12 months. Doc. No. [113], ¶ 44. On or about November 2, 2020, Blankenship learned that Plaintiff was taking intermittent instead of continuous leave. Doc. No. [91-2], ¶ 41. In November 2020, Plaintiff was placed on continuous FMLA leave. Doc. Nos. [91-2], ¶ 42; [112], ¶ 42. Defendants assert Plaintiff's continuous FMLA leave ended in February 2021, while Plaintiff counters that Plaintiff's continuous FMLA leave ended in March

9

2021. Id. On November 3, 2020, WRD headquarters Human Resources Representative, Melanie Holthaus Reed, emailed Plaintiff, with the subject line "Disability Meeting Call," and requested to set up a Zoom meeting with Plaintiff, Blankenship, and Will to discuss Plaintiff's "request for work modifications due to [Plaintiff]'s disability." Doc. Nos. [91-2], ¶ 44; [88-19], 3. On November 5, 2020, Plaintiff emailed Reed about the requested Zoom meeting, her request to continue telework, her health conditions, and Defendants' request for Plaintiff's medical documentation. Doc. No. [88-19], 1–2. In November 2020, Plaintiff and Blankenship continued to correspond by email regarding Plaintiff's request to continue telework, Plaintiff's health conditions, and Defendants' request for medical documentation. Doc. Nos. [88-20], 1–4; [88-21], 1–9.[3]

On November 24, 2020, Plaintiff had a video meeting with Blankenship and Reed to discuss the timeline of events that had transpired since the Covid-19 pandemic began, including Plaintiff's request for FMLA and an accommodation to continue fulltime teleworking. Doc. Nos. [91-2], ¶ 49; [113], ¶ 55. During the meeting, Plaintiff was told not to do any work while she was on FMLA leave.

_____

[3] The Parties dispute the content of those emails. See, e.g., Doc. Nos. [112], ¶ 48; [117], ¶¶ 47–49. Where relevant, those communications will be discussed below.

Doc. No. [91-2], ¶ 51. Blankenship denied that placing Plaintiff on continuous FMLA leave was punitive but told Plaintiff that she would "remain on FMLA, not working until she [had] received clearance to fulfill her job responsibilities that require attendance in the office." Doc. No. [113], 55. Blankenship told Plaintiff that she needed to provide more information about her disabilities to the FMLA Coordinator, Tracy Bowers, Reed, and himself, including the diagnoses for her medical conditions, the life functions that are being impacted by them, and how they prevented her from being able to work in the office. Doc. No. [113], ¶ 56. Blankenship told Plaintiff that Reed would get a Georgia Activity Analysis ("GAA") form, which set forth the essential functions of her position, from Ambrose for Plaintiff to take to her doctors to support her request. Doc. No. [113], ¶¶ 57, 67.

On December 4, 2020, Plaintiff sent Bowers an email responding to Blankenship's request for medical information with medical documentation attached.[4] Doc. Nos. [113], ¶¶ 58–60; [94-8], 1–1410. Bowers gave Blankenship a

---

[4] Judge Fuller overruled Defendants' objections to several of Plaintiff's factual assertions concerning her December 4, 2020 email. Doc. No. [120], 28 n.9. There has been no objection to this evidentiary ruling. The Court has reviewed evidence along with Judge Fuller's determination and finds no error.

copy of Plaintiff's medical documentation. Doc. No. [113], ¶ 61; Bowers Dep. 54–58. On December 9, 2020, Ambrose provided Plaintiff the GAA form he had completed on December 4, 2020 ("December 4, 2020 GAA Form"), which included the following five items under the heading "Essential Duty/Job Function Description":

> 1. Develop and monitor annual budget
> 2. Maintain financial records and monitor expenditures
> 3. Develop budget assessments/amendments to conduct budget closeout
> 4. Monitor contracts and grants and conduct purchasing/procurement
> 5. Provide technical support to HQ and program office administrative staff

Doc. Nos. [113], ¶¶ 64, 67; [100-8], 1. The "Primary Demands" for each function on the December 4, 2020 GAA Form included "[a]ccess to data" or "frequent/timely communication" with others, but did not state that these functions had to be performed in the office. Doc. Nos. [113], ¶ 65; [100-8], 1. The "Required Productivity" and "Work Schedule Requirements" sections of the December 4, 2020 GAA Form likewise stated that Plaintiff needed to meet all deadlines and be available for and respond to requests, but it did not provide that these things must be done in person. Doc. Nos. [113], ¶ 66; [100-8], 1.

12

On December 20, 2020, Blankenship emailed Plaintiff a memorandum about their November 24, 2020 meeting with Reed. Doc. Nos. [91-2], ¶ 53; [91-7], 73–75. On December 27, 2020, Blankenship responded to Plaintiff's December 4, 2020 email and medical documentation and told her that she did not provide the required information about her medical conditions and limitations to be able to "start the interactive process under the ADA." Doc. Nos. [113], ¶ 70; [88-27], 1–2. On January 4, 2021, Blankenship sent Plaintiff an email with another GAA form ("January 4, 2021 GAA Form") attached, and he explained, "[a]ttached is your GAA form which includes attendance to the office as a job requirement." Doc. Nos. [113], ¶ 71; [100-11], 1–3. On January 15, 2021, Defendants placed Plaintiff on Authorized Leave with Pay. Doc. No. [91-2], ¶ 56.

On February 1, 2021, Blankenship had a video meeting with Plaintiff. Doc. No. [113], ¶ 86. During the meeting, Blankenship told Plaintiff that "if [Ambrose] wants to sit in a room and go over a budget scenario with you and stuff, he can do it, he shouldn't have to download this thing and get on a Zoom call." Doc. No. [113], ¶ 94. On February 7, 2021 Blankenship emailed Plaintiff a memorandum ahead of a scheduled meeting about the timeline of events regarding Plaintiff's FMLA status and ADA accommodation requests. Doc. Nos. [88-28], 1–5; [91-2],

¶¶ 57–58. On February 9, 2021, Plaintiff emailed Blankenship stating that she "[disagreed] with the FMLA leave designations" sent to her and attached opinion letters from U.S. Department of Labor ("USDOL") and EEOC. Doc. Nos. [99-10], 1–7; [113], ¶ 98. On February 19, 2021, Blankenship emailed Plaintiff a memorandum with the subject "FMLA, ADA & Transition Plan," which informed Plaintiff that she was required to work in the office beginning March 2021. Doc. Nos. [88-29], 1–5; [91-2], ¶ 59; [113], ¶ 99. On March 23, 2021, Plaintiff emailed Blankenship a memorandum in response to his February 19, 2021 memorandum. Doc. Nos. [88-30], 1–6; [113], ¶ 100. In March 2021, Plaintiff worked the first four Mondays at an alternative location.[5] Doc. Nos. [91-2], ¶¶ 60, 62; [112], ¶¶ 60, 62.

───────────────

[5] Defendants assert that "[i]n an effort to transition Plaintiff back to working in the WRD Headquarters office, [Defendants] allowed Plaintiff to work a transitional schedule where she would work every Monday during the month of March at an alternative location that Plaintiff agreed upon with Ambrose." Doc. No. [91-2], ¶ 60. Plaintiff asserts that "[i]t was [Plaintiff] who proposed that she work in an alternate [location] to satisfy [Blankenship], and she originally proposed to work in a classroom at [Defendants'] office before [Ambrose] said that she would need to go to the Charlie Elliott Wildlife Center" and "[Plaintiff] did not think that location was as good because it did not have internet service or reliable cellular service, and she only accepted working at an alternate [location] because it was all that [Blankenship] would apparently offer." Doc. No. [112], ¶ 60.

14

At some point Plaintiff sent a letter to her gastroenterologist, Dr. Shahriar Sedghi, which explained her work situation, requested that he write a letter to support her request for continued full-time remote work, and included a copy of the December 4, 2020 GAA Form to verify her job duties. Doc. Nos. [94-7], 1–2; [113], ¶ 69. On March 23, 2021, Plaintiff sent Defendants a letter, dated February 26, 2021, from Dr. Sedghi, which stated:

> I am writing at the request of your employee, [Plaintiff], who I treat for a chronic gastrointestinal condition. I have reviewed her job description and am writing to support her request to telecommute during the COVID-19 pandemic in the United States.
>
> [Plaintiff] is currently taking medications that suppress her immune system. These medications are essential to addressing inflammation and symptoms of chronic conditions. The [CDC] has issued guidance and recommendations for individuals in high-risk groups, which include those with compromised immune systems, to practice social distancing, including avoiding large gatherings, and telecommuting for workplace settings.
>
> I understand the essential functions of [Plaintiff's] job are administrative in nature and done on a computer. However, she can perform these essential functions by telecommuting. Since [Plaintiff] can perform the essential functions of her job with this accommodation, and current CDC recommendations call for precautions among immune-compromised patients, [Plaintiff's] request should be granted.
>
> Of course, if I can provide you with any additional information, please do not hesitate to contact me.

15

Doc. No. [94-12],  1. On March 24, 2021, Blankenship wrote to Dr. Sedghi's office, and provided him with the modified January 4, 2021 GAA Form, stating the following:

> I have received your letter from February 26, 2021 for your patient [Plaintiff] DOB [REDACTED] on March 23, 2021. Thank you for your offer to provide us with additional information.
>
> I am writing you today to get additional information on reasonable accommodations that we can provide [Plaintiff[ to allow her to perform all the essential job duties of her position with [Defendants]. [Plaintiff] has been able to perform many of her job duties at home, but she has not been able to perform essential job duties that required her attendance. We are trying to help [Plaintiff] get within Departmental guidelines by returning to work in the office on a reduced schedule of two days a week in the office and three days a week teleworking. I have attached the [GAA form] which accurately describes all her essential job duties.
> We are following CDC guidelines in the workplace by practicing social distancing in the workplace, providing [Plaintiff] with N-95 masks, gloves, and a touchless hand sanitizing station at her office. Other employees are wearing masks as well. Likewise, we are limiting the number of employees in the office each day and we provide [Plaintiff] with her own office.
>
> Since [we are] an agency with approximately 2500 employees throughout the state, we have multiple employees that are medically immune compromised. All these employees have received permission to return to work in their office following CDC guidelines.
>
> Can you provide us with reasonable accommodations that will allow [Plaintiff] to return to work in her office and get her within Departmental guidelines?

> With vaccines readily available, once [Plaintiff] gets a COVID 19 vaccine can she return to work in the office within Departmental guidelines?
>
> We appreciate your time and consideration on this matter as we are trying to work with [Plaintiff] and help her.
>
> Please feel free to contact me if you need any additional information. My cell phone number is [REDACTED].

Doc. No. [94-12], 2. At some point, Blankenship received an undated letter from

Dr. Sedghi's office that stated:

> Dear Sir or Madam, I am writing to you today concerning my patient, [Plaintiff]. I am a Gastroenterologist at Gastroenterology Associates of Central Georgia. [Plaintiff] has asked that I communicate with you about her unique health risks during this coronavirus (COVID-19) pandemic and what you can do to help.
> With the rapidly increasing number of cases of COVID-19, we recommend that this patient be vaccinated for COVID-19 and have adequate access to bathrooms with more frequent ability for bathroom breaks. We believe with these accommodations, [Plaintiff] should be able to return to work.

Doc. Nos. [91-2], ¶ 73; [94-12], 5.

Sometime in March 2021, Defendants learned that Plaintiff filed a complaint with the United States Department of Labor ("USDOL") alleging that Defendants violated her FMLA rights. Doc. No. [91-2], ¶ 63. On March 24, 2021, Blankenship and USDOL had a meeting to discuss Plaintiff's FMLA complaint.

17

Doc. No. [82-10], 1–2. On April 1, 2021, Blankenship sent USDOL a response to Plaintiff's FMLA complaint which was dated March 31, 2021. Doc. Nos. [82-10], 1–7; [113], ¶ 118. USDOL recommended that Defendants restore 294 hours of FMLA leave back to Plaintiff. Blankenship Dep. 175–78; Bowers Dep. 60-61; Elliot Dep. 84. Defendants restored 294 FMLA hours of leave to Plaintiff. Doc. No. [117], ¶ 120.

On April 5, 2021, Commissioner Rabon sent out an agency-wide directive that read:

> Effective May 1, 2021, all employees who have not already returned [to] their Pre COVID schedule will transition to working a minimum of three days a week in the office with an optional two days a week of teleworking. Employees who are currently teleworking and wish to continue to telework beyond the end of April must request and receive approval from their division director to telework up to two days a week.

Doc. No. [91-2], ¶ 72. At some point, Defendants directed Plaintiff to return working in-person at the WRD headquarters on April 5, 2021. Doc. Nos. [88-31], 2; [91-2], ¶ 61; [112], ¶ 61. On April 5, 2021, Plaintiff did not go to work at Defendants' headquarters. Doc. Nos. [91-2], ¶ 62; [112], ¶ 62.

On April 13, 2021, Nurse Kim Reuter from Dr. Sedghi's office emailed Blankenship stating:

> Dear Sir:  I have spoken with Dr. Sedghi again regarding Covid precautions and employment obligations for [Plaintiff].
>
> He recommends that she should be able to work in an office setting two weeks post first Covid vaccine. I believe that she is actively researching her vaccination options and should make her decision soon.

Doc. No. [94-12], 6.

On May 27, 2021, Blankenship sent Plaintiff, and copied to Elliot, a "Return of [Defendants] to Normal In Person Operations" memorandum, which directed Plaintiff to return to in-office work at least three days per week beginning June 14, 2021, unless she provided new medical information by close of business on June 1, 2021. Doc. Nos. [91-2], ¶ 76; [113], ¶ 123; [88-33], 1–2. On June 1, 2021, Plaintiff emailed Blankenship and Elliot with an attached memorandum which requested again to telework on a full-time basis. Doc. Nos. [113], ¶ 124; [80-21], 1–2. Plaintiff attached to her email articles with information on vaccination risks for people with weakened immune systems. Doc. No. [80-21], 1–63. On June 1, 2021, Elliott emailed Blankenship stating:

> My interpretation is that [Plaintiff] needs something from her doctor saying that because of her immunocompromised condition she either cannot be vaccinated or that a vaccine won't be effective. I think only a professional can make that kind of judgement. Even then if cases keep dropping it may be a moot point – the risk of contracting covid may become practically zero, especially if you

wear a mask and stay in your office. I would again want to hear an opinion from her doctor.

Doc. Nos. [81-5], 1; [113], ¶ 129. Blankenship responded to Elliot's email:

I am thinking on the same lines as you but Dr. Sedghi, ([Plaintiff's] doctor that gave her a note that she could work from home and now says that she can be vaccinated and return to work) has cleared her to be vaccinated and to return to the office. [Plaintiff] is going to claim  that Dr. Sedghi isn't qualified to make the call since he is not her autoimmune doctor. She knew this even before he gave her the doctor's note.

Likewise, I am very concerned that [Plaintiff] doesn't have enough work to work from home five days a week. How much of [Plaintiff's] time is being spent on personnel research in light of almost 100 pages of articles that she submitted is trying to find to support her position.

I will consult with [USDOL] tomorrow. Then you and I can discuss a response.

Doc. Nos. [81-5 ], 1; [113], ¶ 130. Plaintiff did not report to work in-person on June 14, 2021. Doc. No. [91-2], ¶ 78.

On June 16, 2021, Blankenship sent Plaintiff a "Failure to Report to [Defendant's] Office" memorandum with a GAA form ("June 16, 2021 GAA Form") for Plaintiff's doctors to complete. Doc. Nos. [88-26], at 1–5; [91-2], ¶ 79; [112], ¶ 79. In this memorandum, Plaintiff was given 30 days, through and including July 16, 2021, to provide the completed GAA form and the answers to the medical questions posed to her, and was also informed that if she failed to

provide the requested information within 30 days she would be subject to adverse action. Doc. Nos. [88-26], 4; [91-2], ¶ 80.

On July 28, 2021, Blankenship sent Plaintiff a "Failure to Report to [Defendant's] Office" memorandum. Doc. Nos. [91-2], ¶ 82; [88-35], 1–4. Blankenship directed Plaintiff to return to work in person on August 2, 2021. Doc. Nos. [88-35], 2; [91-2], ¶ 87. On July 30, 2021, Blankenship sent Plaintiff an email with an FMLA Balance Spreadsheet attached which detailed the FMLA leave that Plaintiff had used from September of 2020 through July 30, 2021. Doc. Nos. [91-2], ¶ 84; [83-5], 1–2. Plaintiff was directed to report any discrepancies with the FMLA balance sheet provided as soon as possible. Doc. Nos. [91-2], ¶ 86; [83-5], [83-5], 1–2). On August 2, 2021, Plaintiff did not go to work at the office. Doc. No. [112], ¶ 87.

On August 3, 2021, Blankenship emailed Plaintiff and stated "[Elliott] advised me on Friday . . . that you have completed your review and now agree that you have used all of your FMLA. We look forward to your return to working in your DNR office on Wednesday, August 4, 2021." Doc. Nos. [91-1], ¶ 88; [113], ¶ 144; [83-5], 1-2. Plaintiff never submitted anything to contradict the FMLA

balances that Blankenship submitted to her, and Plaintiff agreed that she had received credit for all the hours she had worked. Doc. No. [91-2], ¶ 89.

On August 3, 2021, Plaintiff received her first Covid vaccine and requested vaccine leave for the rest of the week to account for receiving the vaccine and addressing vaccine side effects. Doc. Nos. [91-2], ¶ 90; [81-8], 1–4. On August 9, 2021, Elliott emailed Blankenship, Ambrose, and Will the following:

> I just talked to [Plaintiff] on the phone and she does not intend to come into the office while the Delta variant is prevalent. She says she got the vaccine and had a very bad reaction. I told her she needs a doctor's note for all of this. She said she had produced doctors' notes. Although I have not personally seen the notes, I said my understanding is that these notes were not adequate. She said there were open cases with [USDOL] and EEOC. I said I did not know about the EEOC case but [USDOL] was closed. She said she wasn't aware of that. I told her we would need proof of vaccination for the vaccine leave per the recent direction we received from HR.

> I said to go ahead and take a telework day for today to complete the invoices, and direction for the rest of the week will be forthcoming.

> It seems pretty obvious to me that she is not going to come in under any circumstances for the foreseeable future.

> [Blankenship], I will give you a call in a few minutes.

Doc. Nos. [80-34], 1–2; [91-2], ¶ 91; [112], ¶ 91.

22

On August 10, 2021, Blankenship sent Plaintiff a memorandum, in which Plaintiff was directed to report to the office on August 11, 2021 or she may be terminated. Doc. Nos. [91-2], ¶ 93; [113], ¶ 146; [88-36], 1–5. Plaintiff did not work in the office on August 11, 2021. Doc. Nos. [91-2], ¶ 94; [113], ¶ 94. Defendant terminated Plaintiff on August 11, 2021.[6] Doc. No. [113], ¶ 148. Blankenship recommended terminating Plaintiff based on alleged "insubordination by refusing to report to work in [her] office" or provide additional medical information. Doc. No. [113], ¶ 150. On September 1, 2021, Blankenship emailed Elliott and others, requesting more detailed information about what tasks Plaintiff needed to do in the office after Elliott said he and his colleagues did not let things fall through the cracks while Plaintiff was out. Doc. Nos. [113], ¶ 163; [80-31], 1. Elliott produced a memorandum for Blankenship, which was submitted to the GCEO. Doc. Nos. [113], ¶ 164; [80-31], 2-3; [81-2], 1–16.

Ambrose testified that he completed an annual performance review for Plaintiff, which was dated August 6, 2020, for the performance period of July 1, 2019 to June 30, 2020. Ambrose Dep. 35–42; Doc. Nos. [113], ¶ 21; [90-4],

---

[6] Between March 17, 2020 and August 11, 2021, Plaintiff physically came into any of Defendants' offices at most seven times. Doc. No. [91-2], ¶ 98.

1.[7]Ambrose gave Plaintiff an overall rating of four out of five for "Successful Performer- Plus," and commented that "[Plaintiff] works hard to meet customer service objectives," that "[Plaintiff] is responsive to calls to review and adjust budgets and provide other information to meet agency goals," and that "[Plaintiff] does a great job working with other administrative support staff to meet agency goals[.]" Doc. Nos. [113], ¶¶ 21–22; [90-4], 1–2, 8. Ambrose also commented on the performance review that "[Plaintiff] accepts responsibilities for her actions and works hard as a member of the administrative support team," "[Plaintiff] has helped the section work in greater unity by providing feedback and guidance to the program office administrative support staff," "[Plaintiff] has a great job coordinating with other administrative support staff," and "[Plaintiff's] efforts were critical to administrative support operations." Doc. Nos. [113], ¶ 23; [90-4], 2–3, 5.

Ambrose testified that he completed a Mid-Year Performance Evaluation Form for Plaintiff, which was dated January 28, 2021, for the performance period

---

[7] Judge Fuller overruled Defendants' objections to Plaintiff's factual assertions related to the performance assessments completed by Ambrose and Elliot. There has been no objection to this evidentiary ruling. The Court has reviewed evidence and Judge Fuller's determination and finds no error.

of July 1, 2020 to December 31, 2020. Ambrose Dep. 63–64; Doc. Nos. [113], ¶ 24; [90-8], 1. Ambrose gave Plaintiff a rating of 3 for "successful performer." Id. Ambrose wrote in the review that "[Plaintiff] did a very good job keeping up with her workload during the early part of this performance period" and that "[d]espite having to work remotely due to COVID-19, [Plaintiff] was able to get the FY21 budget in place and coordinated with the Assistant Chief and program office administrative support on federal grants, other grants, and contracts." Doc. Nos. [113], ¶ 25; [90-8], 1.

Elliot testified that he drafted a performance evaluation for Plaintiff, which was dated July 12, 2021, for the performance period of July 1, 2020 to June 30, 2021. Elliot Dep. 141–142; Doc. Nos. [113], ¶ 134; [80-3], 2. Elliot proposed to give Plaintiff a "successful performer minus" rating and wrote that "her extended teleworking period created some perceptions among staff that continue to come into the office that not everyone was being treated equally," and "[t]hey questioned why some staff members were allowed to continue telework but others were required to be physically present 3 days per week." Doc. Nos. [113], ¶ 134; [80-3], 2–3.

Plaintiff alleges five comparators, including Employee M, Amanda Hrubesh Clemons ("Employee C"), Employee FFF, Alexandrea Solomon ("Employer S"), and Employe EEE. Doc. No. [113], ¶¶ 172–198.

## II. STANDARD OF REVIEW

With respect to dispositive matters, the Court must conduct a *de novo* review of those portions of the R&R to which a party has timely and specifically objected. 28 U.S.C. § 636(b)(1). The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); United States v. Raddatz, 447 U.S. 667 (1980).

For a party's objections to warrant *de novo* review, it "must clearly advise the district court and pinpoint the specific findings that he disagrees with." United States v. Schultz, 565 F.3d 1353, 1360 (11th Cir. 2009). The Eleventh Circuit noted that "[p]arties filing objections to a magistrate [judge]'s report and recommendation must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court." Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988). The remainder of the R&R, to which neither party offers specific objections, will only be assessed for clear error. See Tauber v. Barnhart, 438 F.Supp.2d 1366, 1373 (N.D. Ga. 2006)

26

("[I]ssues upon which no specific objections are raised do not so require *de novo* review; the district court may, therefore 'accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge[,]' applying a clearly erroneous standard.") (quoting 28 U.S.C. § 636(b)(1)).

With respect to non-dispositive matters, the Court "may reconsider any pretrial matter . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A). A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. Krys v. Lufthansa German Airlines, 119 F.3d 1515, 1523 (11th Cir. 1997). An order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure. Tolz v. Geico Gen. Ins. Co., No. 08-80663-CIV, 2010 WL 384745, at *2 (S.D. Fla. Jan. 27, 2010).

Because the underlying motion is for summary judgment, the Court will set forth the applicable standard for such motions as well. Rule 56(a) of the Federal Rules of Civil Procedure states, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking

summary judgment bears the burden of demonstrating that no dispute as to any material fact exists. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 156 (1970); <u>Johnson v. Clifton</u>, 74 F.3d 1087, 1090 (11th Cir. 1996). In determining whether the moving party has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. <u>Johnson</u>, 74 F.3d at 1090. Once the moving party has adequately supported its motion, the nonmovant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

## III. ANALYSIS

### A. Motion to Exclude

Defendants filed a motion to exclude four opinions from Plaintiff's expert witness, Dr. Scott E. Singer, for purposes of summary judgment and trial. Doc. No. [92],  4. Defendants argued that the Court should not consider the opinions of Dr. Singer "because he is not qualified to make the proffered opinions, because his opinions will not assist the trier of fact, because his opinions are not based on sufficient facts or data, and because his opinions are not reliable." <u>Id.</u> (quoting Doc. No. [92-1], 3–4). In response, Plaintiff submitted the declaration of Mr.

28

Daniel Levitas. Doc. No. [106-1]. Defendants objected to any testimony by Levitas. Doc. No. [118].

Judge Fuller applied the familiar gate-keeping standard established by the Supreme Court. See <u>Daubert v. Merrell Dow Pharms., Inc</u>., 509 U.S. 579, 589 (1993); <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999). He concluded that Dr. Singer can testify to factual opinions that would support a legal conclusion or that discuss the ADA and FMLA. Doc. No. [120], 11. However, Judge Fuller found that Dr. Singer is prohibited from testifying as to the ultimate legal issues of the ADA and FMLA. <u>Id.</u> In addition, Judge Fuller found that another challenged opinion by Dr. Singer—identified in the motion as "Opinion 2"—was sufficiently reliable and may assist the trier of fact. <u>Id.</u> at 14–15. As to Levitas, Judge Fuller overruled Defendants' objections because Plaintiff has not relied on Levitas's opinion in opposition to the Motion for Summary Judgment and has not indicated that she intends to call him at trial.

No objections were filed with respect to these evidentiary rulings. Therefore, the recommendations are before this Court under the clear error standard. Finding no error, the Court **ADOPTS** the recommendations related to the expert testimony of Dr. Singer and the objections to Levitas's testimony.

### B.    Motion for Summary Judgment

#### 1.    *Qualified Individual*

Defendant moved for summary judgment on Plaintiff's claims for discrimination under the ADA and the Rehab Act, arguing that Plaintiff cannot carry her burden of creating a triable issue of fact on whether she was a "qualified" individual. The argument is based on Defendants' position that "physical attendance in the office at least two to three days a week was an essential function of Plaintiff's administrative job." Doc. No. [91-1], 6–10.

In the R&R, Judge Fuller set forth the evidence relied on by each side regarding the issue of whether physical attendance was an essential function of Plaintiff's job. Doc. No. [120], 43–54. After thoroughly sifting through this evidence, Judge Fuller found conflicts; therefore, he determined that when the record is viewed in the light most favorable to Plaintiff—as is required in analyzing a defendant's summary judgment motion—"there is at least a genuine issue of material fact" whether physical attendance was an essential function of Plaintiff's job. Id. at 54.

Defendants argue that Judge Fuller incorrectly determined that there was a question of fact as to whether Plaintiff was a "qualified individual." Doc. No. [124], 4. Specifically, Defendants claim that in-office present was an essential

function of Plaintiff's job. To support this position, Defendants cite to testimony of multiple witnesses who stated that Plaintiff's absence from the workplace had "a negative impact on operations, including [Plaintiff]'s lack of coordination with other employees, not returning emails and phone calls promptly, missed budget amendment deadlines because employees were unable to reach [Plaintiff] for her input, and others having to perform some of [Plaintiff]'s duties. Id. at 7 (citing Will Dep. at 72:16–76:14; 94:10–96:23; 99:4–9; 132:23–136:20; 179:5–182:23; Blankenship Dep., Ex. 53 at 2; Ambrose Dep. at 85:7–88:19; Elliot Dep. at 10:16–16:12, 35:2–18, Ex. 107 at 2–3. Further, Defendants point to testimony that indicates Plaintiff's "remote status caused delayed communications and difficulties in getting timely information, which prevented the division from running efficiently." Id. (citing Will Dep. at 72:16–76:14, 94:10–96:23, 99:4–9, 181:2).

In objecting to Judge Fuller's conclusion that there is a question of fact as to whether physical presence was an essential function of Plaintiff's job, Defendants simply ignore the evidence adduced by Plaintiff. For example, Plaintiff has testified that before the pandemic, she performed all her job duties using a computer and telephone, and that she communicated with others in the

31

workplace via email and telephone. Doc. No. [109], ¶ 4. She further stated that only on two occasions per year did she meet with someone in the workplace. Id. at ¶¶ 8, 9. More important, however, are the GAA forms that set forth the essential duties of Plaintiff's job: the December 4, 2020 GAA form did not include in-office duties while the form prepared just one month later included in-office duties. Doc. Nos. [100-8], 1; [100-11], 2. Furthermore, Plaintiff has adduced evidence that the reason for the in-office requirement was not because it was an essential function but instead was political. Pl. Dep. 258–64.

Defendants may not prevail on summary judgment by simply ignoring evidence they disagree with. While there is evidence from which a jury could find that physical presence was an essential function of Plaintiff's job, there is also evidence from which the factfinder could conclude the opposite. This is a quintessential fact question to be resolved at trial. As such, Judge Fuller correctly recommended denial of summary judgment on the issue of whether Plaintiff is a qualified individual.

### 2.    *Showing of Pretext*

Defendants also contend that the Magistrate Judge incorrectly found that Plaintiff established a fact issue on whether the articulated reason for Plaintiff's

termination was pretextual.[8] Doc. No. [124], 12–15. Specifically, Defendants contend that the Magistrate Judge improperly focused on Plaintiff's communications with Elliott rather than what Blankenship, the decisionmaker on Plaintiff's termination, believed. Id. at 13.

The Court agrees with Defendant that the proper inquiry on the question of pretext is what Blankenship believed. And this is precisely the inquiry undertaken by the Magistrate Judge. See Doc. No. [120], 64–67. As Judge Fuller pointed out, there is evidence that Plaintiff sent Blankenship an email with an attached memorandum clarifying that she was not seeking a permanent accommodation; rather her ADA request was "until [she] may be vaccinated and safely integrated back into the office[.]" Doc. No. [88-30], 1, 4; Pl. Dep. at 207. Yet Blankenship, knowing that Plaintiff received her first vaccine dose only eight days earlier, terminated her. Blankenship Dep. at 236. Thus, Defendants' objection on the issue of pretext is without merit.

─────────────────────

[8] In the Objections, Defendants address pretext only as to one of their two articulated reasons for firing Plaintiff: her refusal to come to work. Thus, for purposes of summary judgment, the Court considers their second articulated reason for terminating Plaintiff—her failure to provide sufficient information to support her request for telework—abandoned.

### 3.    *Reasonableness of Requested Accommodation*

In moving for summary judgment, Defendants argued that Plaintiff's requested accommodation—that she not be required to work physically in the office until she determined she was fully and safely vaccinated against COVID-19—is "inherently unreasonable." Doc. No. [91-1], 21. In the R&R, Judge Fuller addressed this argument and found that the evidence in this case created an issue of fact as to whether Plaintiff requested an indefinite period of leave. Doc. No. [120], 82.

In the objections, Defendants devote four and half pages to a discussion regarding the record evidence in this case and conclude, "At no point in time did [Plaintiff] provide sufficient information which would support her request for 100% telework for an indefinite period of time." Doc. No. [124], 8–12. There is no assertion of error by the Magistrate Judge and no specific objection. Moreover, the conclusion ignores the factual question pointed out by the Magistrate Judge—whether Plaintiff requested leave for an indefinite period of time. Doc. No. [120], 82. Accordingly, to the extent Defendants raise an objection regarding Plaintiff's claims for failure to accommodate, the objection is **OVERRULED**.

## IV. CONCLUSION

Based on the foregoing, Defendants' Objections (Doc. No. [124]) to the R&R are **OVERRULED**, and the R&R (Doc. No. [120]) is **ADOPTED** as the order and opinion of this Court.

The Court deems this case appropriate for mediation and **ORDERS** the Parties to participate in a mediation of this case before an assigned United States Magistrate Judge for the Northern District of Georgia. Accordingly, the Court **REFERS** this case to Chief Magistrate Judge Russell G. Vineyard for assignment to the next available Magistrate Judge. Mediation will be scheduled at the discretion and convenience of the Magistrate Judge assigned. The Parties are **ORDERED** to file notice within **5 DAYS** of the conclusion of mediation advising this Court of the outcome. The Parties are further **ORDERED** that, if mediation is unsuccessful, they shall file their consolidated proposed pretrial order with this Court within **30 DAYS** of the conclusion of mediation.

**IT IS SO ORDERED** this 3rd day of July, 2024.

HONORABLE STEVE C. JONES
**United States District Judge**

35